**GUCCI AMERICA, INC., Plaintiff,**

v.

**DUTY FREE APPAREL, LTD. d/b/a Duty Free Apparel, Inc., Joel Soren, Harvest Wrap, Inc., Kurt Davidsen and John Does 2–20, Defendants.**

**No. 02 Civ.1298(VM).**

United States District Court, S.D. New York.

Oct. 6, 2003.

See, also, 2003 WL 21910938.

Milton Springut, Tal S. Benschar, Kalow & Springut, LLP, New York City, for Gucci America, Inc.

Steven M. Lester, Law Offices of Steven M. Lester, East Meadow, New York City, for Duty Free Apparel, Ltd. and Joel Soren.

Darren Oved, Oved & Oved, LLP, New York City, for Harvest Wrap, Inc. and Kurt Davidsen.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Gucci America, Inc. ("Gucci") alleges that defendants Duty Free Apparel Ltd. ("DFA") and Harvest Wrap, Inc. ("Harvest Wrap") sold counterfeit Gucci merchandise in violation of federal and state law. Gucci seeks an entry of partial summary judgment on the issue of liability for its federal claims against all four defendants: DFA, DFA President Joel Soren

("Soren"), Harvest Wrap, and Harvest Wrap owner Kurt Davidsen ("Davidsen") (collectively, "Defendants"). Gucci also seeks to enjoin Defendants from selling counterfeit Gucci merchandise in the future. For the following reasons, Gucci's motion is granted.

## I. *BACKGROUND*

■ Gucci owns the trademark and trade name "GUCCI" and various "G" and "GG" logos and designs. (Compl.¶ 7.) These trademarks are associated with various articles of jewelry, watches, handbags, wallets, and accessories. (*Id.*) DFA, a Manhattan retailer of designer merchandise and accessories, sold a "Gucci" wallet to a Gucci investigator for $150 on August 14, 2000. (Decl. of Cece McNair, dated July 15, 2003 ("McNair Decl.") ¶¶ 2–3.) That same day, DFA sold to another Gucci investigator a "Gucci" handbag for $350. (Decl. of Kevin Dougherty, dated July 15, 2003 ("Dougherty Decl.") ¶ 4.) In May 2001, an assistant for Gucci's outside counsel purchased a "Gucci" handbag from DFA's website for $415. (Decl. of Vanessa Beigner, dated July 21, 2003 ("Beigner Decl.") Ex. A.)

After Gucci initiated this lawsuit, DFA identified Harvest Wrap as its source for "Gucci" goods, and Gucci added Harvest Wrap as a defendant. (Decl. of Tal S. Benschar, dated July 21, 2003 ("Benschar Decl.") Ex. D, at 3.) At some point in late 2002, Harvest Wrap sold several "Gucci" backpacks to Sherry Dvorkin ("Dvorkin"), who is in the business of selling women's accessories through private sales, including sales on the internet. (*Id.* Ex. B, at 160–61 and Ex. C, at 5, 19–20.) Gucci subpoenaed Dvorkin to appear at a deposition in connection with this lawsuit. (*Id.* Ex. C, at 14.) She testified that she purchased over $50,000 worth of merchandise from Harvest Wrap in several cash trans-

actions with Davidsen. (*Id.* at 23.) An invoice of her transactions indicates that she purchased 173 "Gucci" backpacks and 44 "Gucci" pouch bags, along with 24 "Fendi mamma bags" and 503 "Prada key chains." (*Id.* at 60.) She turned over to Gucci's lawyers two of the "Gucci" backpacks she obtained from Harvest Wrap, along with the invoice. (*Id.* at 36.)

Gucci's expert, Luciano Chiarelli ("Chiarelli"), has determined that all five of the above "Gucci" items which Gucci obtained for this lawsuit – the wallet and two handbags from DFA and the two backpacks from Harvest Wrap – are counterfeit. (Decl. and Expert Report of Luciano Chiarelli, dated Jan. 18, 2003 ("Chiarelli Decl.") ¶ 8; Supp. Decl. and Expert Report of Luciano Chiarelli, dated Feb. 26, 2003 ("Supp. Chiarelli Decl.") ¶ 3.) Chiarelli has been associated with Gucci since 1969 and has been head of the Quality Control department since 1995. (Chiarelli Decl. ¶ 2.) He has participated in numerous federal cases on Gucci's behalf. (*Id.* ¶ 11.) The purchasers of the "Gucci" items at issue stated that they immediately marked and turned over the items to Gucci's lawyers, and Chiarelli's report indicates that he received those marked items from Gucci's lawyers for the purpose of evaluating their authenticity. (Beigner Decl. ¶ 4; Dougherty Decl. ¶¶ 4–5; McNair Decl. ¶¶ 3–4; Benschar Decl. Ex. B, at 36; Chiarelli Decl. ¶ 7; Supp. Chiarelli Decl. ¶ 2.)

Gucci supplies its leather goods assembly factories with the component parts and the necessary materials for assembly. (Chiarelli Decl. ¶ 4.) Those factories then must account for all of these materials. (*Id.* ¶ 6.) Assembled items must meet Gucci's quality control standards before being sold to the public. (*Id.*) Those items that do not meet the standards are either destroyed, or, if the defects are minor, the

items are marked as "seconds" and sent to Gucci's outlet store in Florence, Italy. (*Id.*)

Chiarelli obtained authentic component parts from Gucci suppliers and compared those parts with the components of the items at issue here. (Reply Decl. of Luciano Chiarelli, dated Sep. 8, 2003 ("Reply Chiarelli Decl.") ¶ 13.) Chiarelli's report identifies various deviations in each of the five items. (Chiarelli Decl. ¶ 8; Supp. Chiarelli Decl. ¶ 3.) For example, Chiarelli asserts that one of the handbags contains a gold-colored closure and buckle, which has never been used on that particular style of bag, and the Gucci logo on the backpacks is different from the genuine logo. (*Id.*) The items in evidence are not marked as "seconds." (Reply Chiarelli Decl. ¶ 15.)

DFA states that it no longer sells items from Harvest Wrap. (Decl. of Joel Soren in Opposition to Plaintiff's Motion for Partial Summary Judgement, dated Aug. 11, 2003 ("Soren Decl.") ¶ 3.) DFA and Soren consent to an injunction, but they object to certain parts of Gucci's formulation of the proposed order.[1] (*Id.* ¶¶ 6–10.)

Harvest Wrap concedes selling backpacks to Dvorkin, but it denies that any of the five items at issue came from Harvest Wrap, as it only sells authentic goods. (Defendants Harvest Wrap, Inc. and Kurt Davidsen's Affidavit in Opposition to Plaintiff's Motions, dated Aug. 11, 2003 ("Davidsen Aff.") ¶¶ 21, 22, 29.) Alternatively, Harvest wrap asserts that there is at least an issue of fact as to whether the items are in fact counterfeit. (Defendants Harvest Wrap and Kurt Davidsen's Memorandum of Law in Opposition to Plaintiff's Motion

for Summary Judgment and in Opposition to Plaintiff's Motion for a Permanent Injunction ("Harvest Wrap Mem.") 9–12.)

## II. *SUMMARY JUDGMENT STANDARD*

The Court may only grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine" – *i.e.,* "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

In a case such as this one where the plaintiff would ultimately bear the burden of persuasion at trial, the plaintiff must make a *prima facie* showing, with sufficient admissible evidence, that there are no genuine issues of material fact for trial. *Celotex,* 477 U.S. at 331, 106 S.Ct. 2548. After such a showing, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading"; the non-moving party must respond with

---

1. DFA and Soren did not submit a memorandum of law in opposition to Gucci's motion. Instead, Soren submitted a declaration. The only portion of that declaration germane to the liability issue is a single paragraph in which Soren states that Gucci does not pro-

vide sufficient facts to trace the chain of custody of the "Gucci" items at issue. (Soren Decl. ¶ 5.) The Court addresses that issue in more detail in connection with Harvest Wrap's more substantive opposition.

"specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

### III. *DISCUSSION*

#### A. *LIABILITY*

As relevant to this motion for summary judgment, Gucci claims that Defendants have violated Sections 32(1) and 43(a) of the Lanham Act (the "Act"), 15 U.S.C. §§ 1114(1), 1125(a). For both Lanham Act claims, Gucci must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that Defendants' actions are likely to cause confusion as to the origin of the mark.[2] *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996). The parties do not dispute the validity of Gucci's mark, and thus the Court's resolution of this motion will turn on the likelihood of confusion.

In considering the likelihood of confusion, Courts in this Circuit generally look to the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (1961): "the strength of [plaintiff's] make, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *See, e.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871–72 (2d Cir.1986) (applying *Polaroid* factors).

In this case, however, the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion. *See Topps Co., Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y.1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the *Polaroid* factors."). Indeed, confusing the customer is the whole purpose of creating counterfeit goods. *Cf. Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir.1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."). Thus, the Court need only determine the more fundamental question of whether there are items to be confused in the first place – that is, whether the items at issue here are, in fact, counterfeit and whether Defendants sold those items. Harvest Wrap asserts that there are genuine issues facts

---

**2.** Section 43 is a broader provision which "protects unregistered trademarks similar to the way that section 32(1) ... protects registered marks." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir.2002). The difference is not relevant to this action.

as to both questions. The Court disagrees.

Gucci's expert Chiarelli explained both his credentials and the bases for his conclusion that the five items in question are counterfeit. As stated above, Chiarelli identified several deviations in each of the five items at issue, and Gucci has accounted for the chain of custody of the items from the sellers to Chiarelli. Defendants have produced no evidence, expert or otherwise, that sufficiently refutes Chiarelli's findings. The Court concludes that, with this evidence alone, no reasonable juror would fail to hold Defendants liable. Thus, the Court concludes that Gucci has made a *prima facie* case that it is entitled to summary judgment.

Harvest Wrap responds, first, by asserting that there are fact issues as to the authenticity of the bags. It points out that Chiarelli failed to perform a side-by-side comparison with fully-assembled Gucci items, and that Chiarelli has failed to foreclose the possibility that the alleged deviations occurred sometime *after* the bags were authentically manufactured. Harvest Wrap points out that the items could have been irregular but authentic Gucci merchandise, or diverted overstock merchandise.

■ Harvest Wrap next questions the chain of custody of the items. Harvest Wrap denies having supplied the three items purchased from DFA because, as the depositions indicate, the Harvest Wrap–DFA relationship began after those bags were sold.[3] Harvest Wrap acknowledges

that Davidsen met with Dvorkin and sold her "Gucci" backpacks, but Harvest Wrap disputes virtually every other aspect of Dvorkin's story. Specifically, Harvest Wrap contends that the invoice Dvorkin has produced is a complete forgery. Harvest Wrap supplied a sample real invoice, which appears somewhat different. (*Compare* Harvest Wrap Mem. Ex. B *with id.* Ex. E.) Davidsen indicated at his deposition that he sold Dvorkin *only* "Gucci" backpacks, not any pouch bags nor any items from other designers. (Benschar Decl. Ex. B, at 178.) He also asserted that he only sold her around 70 to 80 bags for about $100 each, as opposed to the over $50,000 worth of merchandise indicated on the invoice. (*Id.* at 163.) Davidsen testified that the transaction took place later in the month of November 2002, instead of the date indicated on Dvorkin's invoice, November 6, 2002. (*Id.* at 176.) Harvest Wrap also highlights various inconsistencies in Dvorkin's testimony, as a means to call into question her credibility in general. (Harvest Wrap Mem. 13–19.) All of this evidence is apparently intended to show that there is an issue of fact as to whether Harvest Wrap actually sold the allegedly counterfeit backpacks now at issue.

The Court concludes that Harvest Wrap has failed to counter Gucci's compelling *prima facie* case. Under the applicable standards set forth above, to defeat summary judgment, the opponent of a such a motion must produce "specific facts," Fed. R.Civ.P. 56(e), or "some hard evidence," *D'Amico*, 132 F.3d at 149, in opposition. "The mere existence of a scintilla of evi-

---

**3.** Gucci disputes this deposition testimony and has produced copies of two checks from DFA to Harvest Wrap dated October 2000. (Reply Decl. of Tal S. Benschar, dated Sep. 15, 2003 ("Benschar Reply Decl.") Ex. E.) The Court concludes that there is a genuine issue of fact as to whether these three items originated from Harvest Wrap. However, this motion relates only to liability, not damages. As the Court explains, *infra*, there is no genuine dispute that the two backpacks are traceable to Harvest Wrap. Thus, the remainder of this discussion analyzes Harvest Wrap's potential liability only with respect to the two backpacks Harvest Wrap sold directly to Dvorkin.

dence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Mere speculation or "metaphysical" possibilities alone do not suffice to counter specific evidence. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. It is notable that Harvest Wrap failed to produce any affirmative evidence that the items in evidence are actually authentic, either through an expert[4] or through an explanation of their origins. Harvest Wrap entirely fails to account for the specific deviations contained in Chiarelli's report.

Moreover, Harvest Wrap fails to offer specific evidence supporting its hypothesis that these particular bags escaped the Gucci's rigorous quality control measures. To be sure, the Court recognizes that Gucci's quality control measures are likely not foolproof and that authentically-manufactured Gucci items containing deviations may wind up in the retail market. However, Harvest Wrap cannot defeat a *prima facie* case of summary judgment based on the mere speculation that this unlikely possibility came about in this particular case.

Harvest Wrap's argument regarding Dvorkin's custody of the two backpacks is likewise unavailing because it rests on speculation. Harvest Wrap concedes that, sometime in late November 2002, it sold Dvorkin backpacks of the same style as those at issue. It asserts that there is a genuine issue of fact as to whether Dvorkin handed over a *different* set of backpacks to Gucci's attorneys. The only evidence Harvest Wrap offers in support of that hypothesis is the obviously question-begging assertion that it only sells genuine merchandise. Harvest Wrap's disputes over the timing and quantity of the transaction, and of the authenticity of the invoice, are simply immaterial because Harvest Wrap concedes that it sold Dvorkin at least two backpacks of the same style as the two at issue. It is the authenticity of those items that is at issue. A portion of Davidsen's deposition illustrates why summary judgment is appropriate:

Q: Mr. Davidsen, let me show you two – I guess you call them backpacks, one that's marked Plaintiff's Exhibit 30 and the other is marked Exhibit 31. Are these the type of bags, Gucci bags that you sold to Sherry [Dvorkin] and [her fiancé]?

A: They look like it.

Q: Same styles?

A: Yeah.

Q: Can you tell if, in fact, these are bags that you indeed sold to them?

A: No, I can't.

Q: But it's the same style?

A: The same style, yes.

Q: If Sherry [Dvorkin] testified that these bags came from you would you have any basis to dispute that?

A: She could have bought them from somebody else.

Q: Do you have any basis for –

A: For saying that?

Q: – for disputing that?

A: Listen, they made an invoice with all kinds of stuff that they didn't bought [sic] from me, so why would that be unusual?

---

4. In *Gucci America, Inc. v. Accents*, 955 F.Supp. 279, 283 (S.D.N.Y.1997), for example, the defendants' expert testified that the differences between the real and allegedly counterfeit Gucci items at issue were "either indistinguishable in fact or not always a reliable basis for distinguishing real from counterfeit goods."

Q: Well, is there anything that you have that could prove that these bags were not purchased from you?

A: No, I do not.

(Benchar Decl. Ex. B, at 190.) In short, Harvest Wrap has no evidentiary basis to counter Dvorkin's testimony that she bought the backpacks from Harvest Wrap. The notion that Dvorkin substituted Harvest Wrap's genuine merchandise with another set of counterfeit merchandise is pure speculation and will not defeat a motion for summary judgment.

Finally, Harvest Wrap asserts that whether or not it is in the business of selling counterfeit goods – as opposed to merely having sold two counterfeit items – is an issue of material fact which should preclude summary judgment. The Court disagrees. The plain language of the relevant statutes does not require that the plaintiff prove that a defendant committed the infringement in any particular amount, or with any amount of regularity. *See* 15 U.S.C. §§ 1114(1), 1125(a). "[T]he amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates." *General Elec. Co. v. Speicher,* 877 F.2d 531, 537 (7th Cir.1989).[5]

## B. *INJUNCTION*

To obtain a permanent injunction, Gucci must demonstrate (1) actual success on the merits and (2) irreparable harm. *See Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 148 n. 13 (S.D.N.Y.1990).

The preceding discussion establishes Gucci's success on the merits, and in this Circuit, a showing of likelihood of confusion establishes irreparable harm. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997). Accordingly, Gucci is entitled to a permanent injunction enjoining Defendants from further trademark infringement against Gucci.

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion of plaintiff Gucci America, Inc. ("Gucci") for entry of partial summary judgment of liability for violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), as against defendants Duty Free Apparel, Ltd., Joel Soren, Harvest Wrap, Inc., and Kurt Davidsen (collectively, "Defendants") is GRANTED; it is further

**ORDERED** that Defendants, their agents, and employees are hereby permanently enjoined from selling, offering for sale, advertising or distributing any counterfeit goods bearing any Gucci trademark, and from infringing on any Gucci trademarks.

**SO ORDERED.**

---

5. Harvest Wrap cites to a case in this District, which appears to support its position: "Whether or not Defendants are in the business of buying and selling counterfeit goods – as opposed to simply offering two pairs of counterfeit jeans ... on a single occasion – is a factual question *material to the determination of Defendants' liability* (and Plaintiff's damages) under the Lanham Act." *Calvin Klein Jeanswear Co. v. Tunnel Trading,* No. 98 Civ. 5408, 2001 WL 1456577, at *10 (S.D.N.Y. Nov. 16, 2001) (emphasis added). *Unlike that case, Gucci is only seeking summary judgment with respect to liability, not damages.* In any event, the apparent implication that merely offering two pairs of counterfeit jeans is lawful is contrary to the plain language of the Lanham Act.