GUCCI AMERICA, INC., Plaintiff,

v.

DUTY FREE APPAREL, LTD. d/b/a Duty Free Apparel, Inc., Joel Soren, Harvest Wrap, Inc., Kurt Davidsen and John Does 2–20, Defendants.

No. 02 Civ. 1298(VM).

United States District Court, S.D. New York.

April 23, 2004.

512

Tal S. Benschar, Milton Springut, Kalow & Springut, L.L.P., New York, NY, for Gucci America, Inc.

Steven M. Lester, East Meadow, NY, for Duty Free Apparel, Ltd. and Joel Soren.

Terrence A. Oved, Oved & Oved, New York, NY, for Harvest Wrap, Inc.

### DECISION AND ORDER

MARRERO, District Judge.

In this trademark infringement lawsuit, the Court previously determined that defendant Joel Soren ("Soren") and his corporation, Duty Free Apparel, Inc. ("DFA") unlawfully sold counterfeit merchandise bearing trademarks of plaintiff Gucci America, Inc. ("Gucci"). Later, the Court determined that, after having been found liable, DFA again sold counterfeit Gucci merchandise in violation of a Court-imposed injunction. The Court conducted a two-day bench trial to determine whether the unlawful sales were willful and to determine the proper remedy. As explained in more detail below, the Court finds that DFA and Soren acted willfully in both the initial counterfeit sales and in violating the Court's injunction, and that a statutory damages award of $2 million is appropriate. The Court will also enjoin DFA and Soren from future Gucci sales, unless they maintain records to establish that their Gucci merchandise originates from authorized Gucci dealers. Finally, the Court addresses Gucci's outstanding attorney's fees and costs application in connection with the investigation and prosecution of DFA and Soren's contempt. The Court concludes that Gucci is entitled to its full request, totaling an additional $59,584.62.

## I. FINDINGS OF FACT

### A. PROCEDURAL HISTORY

Gucci is a famous designer brand of jewelry, watches, handbags, wallets, and other accessories. Soren is the president and sole officer and shareholder of DFA, a midtown Manhattan retailer of discounted designer merchandise. Gucci filed this lawsuit in February 2002 alleging that DFA and Soren sold counterfeit Gucci merchandise in violation of federal trademark laws, and also raising related state law causes of action. In response to Gucci's interrogatories, DFA identified Harvest Wrap, Inc. ("Harvest Wrap") as its only source for Gucci goods. Gucci then amended its complaint to add Harvest Wrap and its principal, Kurt Davidsen ("Davidsen"), as defendants.

Gucci successfully moved for summary judgment on the issue of liability. *See Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284 (S.D.N.Y.2003). In a decision dated October 6, 2003, the Court determined that DFA had sold to Gucci investigators a counterfeit wallet and

two counterfeit handbags, and enjoined DFA and Soren from selling any more counterfeit Gucci merchandise. *See id.* at 290. The Court also determined that Harvest Wrap had sold at least two counterfeit Gucci backpacks directly to an individual in the business of reselling women's accessories. *See id.*

Gucci returned to court shortly after the Court's summary judgment decision, alleging that DFA had continued to sell counterfeit Gucci merchandise. The Court preliminarily enjoined DFA and Soren from selling any Gucci merchandise, even if authentic. After a two-day contempt hearing in December 2003, the Court determined that, within one month of the Court's summary judgment Decision and Order, DFA had indeed sold Gucci investigators three more counterfeit Gucci items (a handbag, a cosmetic bag, and a key case), in violation of the Court's injunction. *See Gucci America, Inc. v. Duty Free Apparel, Ltd.,* 296 F.Supp.2d 461 (S.D.N.Y.2003).

In light of that finding, the Court maintained its preliminary injunction preventing DFA or Soren from selling any Gucci items. The Court immediately scheduled a trial date determine whether the sales were willful (a necessary prerequisite to determining appropriate relief) and to fashion the proper remedies. Before trial, Gucci settled its claims as against Davidsen and Harvest Wrap. The Court held a two-day bench trial on March 15 and 16, 2004, to resolve the remaining claims pertaining to DFA and Soren.[1]

## B. *DFA'S DEALINGS WITH HARVEST WRAP*

At trial, Soren cast himself as an innocent retailer who was briefly duped by Harvest Wrap, a rogue supplier of high-quality counterfeits. The Court concludes, however, that virtually all of the evidence Soren produced to support that characterization is far from persuasive. More generally, all of Soren's testimony is under considerable doubt because, as the Court will explain, his testimony was frequently contradictory or implausible.

Soren began selling Harvest Wrap's Gucci brand merchandise at least as early as August 2000, when DFA sold the first of six items the Court ultimately determined to be counterfeit. That same month, Prada, another famous designer brand, filed a lawsuit against DFA alleging that DFA's Prada brand goods were counterfeit. Soren testified that he was also purchasing Prada goods at that time from Harvest Wrap, and that he told Davidsen about Prada's lawsuit. Soren apparently did not take any steps to verify the authenticity of Harvest Wrap's Prada brand merchandise. The parties to that lawsuit ultimately stipulated to an injunction against DFA and to dismissing the lawsuit.

On October 6, 2000, Gucci sent DFA a cease-and-desist letter stating that it believed DFA was selling counterfeit Gucci items. At trial, Soren testified that he responded to that letter as follows. First, on the advise of his lawyer, Soren stopped selling Harvest Wrap's Gucci brand merchandise. Specifically, he stowed those items on the second floor of DFA's premises, away from the selling floor. Second, he immediately began returning the goods to Harvest Wrap, little by little – although without initially informing Harvest Wrap of the reason for the returns – as credits towards purchases of other name brand merchandise (presumably because Harvest Wrap would not give Soren his money

1. Because Soren is the sole shareholder and president of DFA, and because he alone decides which goods DFA will offer for sale, the Court will, for simplicity's sake, refer to Soren as essentially interchangeable with DFA.

back). Soren claims he had sold only approximately 20 to 50 of the approximately 2,000 Gucci brand items he had purchased from Harvest Wrap before he began returning them. However, Soren testified that he continued to sell Gucci brand merchandise he had acquired from other sources, such as authorized dealers in Italy. Third, sometime in the summer of 2003, after Soren had returned all the Gucci goods which Harvest Wrap would accept, Soren transported the leftover Harvest Wrap items (about 370 pieces) to his garage at his home on Long Island, never to be sold again.

This account is suspect or not supported by the record on almost every point. Soren testified at a deposition in July 2002 that he continued to buy Gucci merchandise from Harvest Wrap even after this lawsuit was filed in February 2002, *i.e.*, long after Gucci's October 2000 cease-and-desist letter. In a June 2003 deposition, Soren testified that he did not recall doing *anything* in response to the cease-and-desist letter and that he continued to sell Gucci brand merchandise. Soren also indicated at that deposition that he had been buying goods from Harvest Wrap up until late 2002 or early 2003. Soren's attempt to reconcile this contradiction at trial – stating that he was "confused with the dates" – was unconvincing, especially because Soren was questioned about those dates repeatedly at both his depositions and at trial. (Trial Transcript ("Tr.") at 100–01).

Moreover, Soren made no mention in his deposition of having removed nearly 2,000 items for sale, and he failed to produce those items for inspection (as properly requested) during discovery. Soren specifically testified at the December 2003 contempt hearing that he did not have any merchandise anywhere except at his store in midtown Manhattan, directly contradicting his version of the events presented at trial. The existence of the leftover Harvest Wrap items was first made known to Gucci and the Court in a letter from Soren's attorney dated March 8, 2004 – one week before trial. The late disclosure forced Gucci to take Soren's deposition on the eve of trial in order to prepare as regards the last-minute development.

The Court concludes that Soren's failure to disclose the existence of the leftover Harvest Wrap merchandise was willful and that he concealed this material information either because he sought to resell the merchandise at some point, or because he thought it would be to his advantage in this litigation not to reveal its existence. Once the Court scheduled a trial on damages only, it became advantageous for Soren to admit that he had *not* sold some of that merchandise, and he belatedly divulged the existence of those items.

In addition to the string of contradictions and omissions that filled Soren's testimony, there is direct evidence of DFA's continued dealings with Harvest Wrap. Gucci admitted into evidence at least 30 cancelled checks from DFA to Harvest Wrap containing a hand written notation of "Gucci," presumably made by Soren or with his knowledge, and dated *after* October 2000. At trial, Soren stated that all of those checks pertained to *returns*, not purchases. This explanation is implausible because almost all of those checks contain only Gucci's brand name, and no indication of another brand name for which Soren would be exchanging the Gucci goods. Moreover, most of the Gucci checks specifically list the quantity and price of the goods, which happen to correspond exactly to the amount of the check. For example, one DFA check dated May 23, 2001, includes the notation

77pcs × 147
Gucci

(Tr. Ex. 22). Not surprisingly, the check is made out in the amount of $11,319 (*i.e.*, 77 times 147). There are dozens of such checks, all of which the Court concludes represent purchases, not returns.[2] The most recent check in evidence from DFA to Harvest Wrap is dated December 2002.

The Court concludes that, throughout this more than two-year period, Soren either knew, or should have known, that Harvest Wrap's Gucci brand merchandise was counterfeit. Having received Gucci's cease-and-desist letter in October 2000 and Gucci's complaint in this action in early 2002, Soren should have at least known there was reason to inquire further about the authenticity of that merchandise.[3] Moreover, Soren must have known, if not prior to August 2000 certainly at many points thereafter, that Harvest Wrap was obviously not an authorized Gucci dealer. He should have also been aware of the risk of dealing in merchandise obtained through such unusual channels, and without the benefit of authenticating documentation. Instead of directly confronting that risk, or directly seeking to counter Gucci's allegations, Soren relied upon (1) Davidsen's assurances "that the goods were a thousand percent authentic"; (2) his own assessment that the goods "looked perfect"; and (3) the fact that no other designers had challenged his business practices. (Tr. 63) Moreover, even in the face of Gucci's lawsuit, rather than directly confronting Harvest Wrap with the accusation that the Gucci goods Harvest Wrap had sold DFA were fake, Soren instead began surreptitiously and without further explanation simply returning that merchandise in exchange for "credits".

Of the six DFA items the Court has determined to be counterfeit, the Court's examination reveals that five of those items are sophisticated counterfeits. Gucci's expert relied upon relatively detailed observations to determine that those items were counterfeit. This fact arguably would lend some support to Soren's assertion that he had no reason to question the authenticity of Harvest Wrap's Gucci brand merchandise. However, Soren himself conceded that the sixth item, a "Jackie O" handbag, is of an obviously inferior quality. He described it as having "cheaper" leather and testified that "a five-year old could tell the difference" between the leather on that bag and the high-quality leather of the designer goods DFA would sell. (Contempt Hearing Transcript ("Hg.") at 40) The Court's own examination of the bag confirms that it is not made of high-quality leather. This observation should have given Soren all the more reason to question the authenticity of that bag, as well as any merchandise from the same source.[4] Instead, he passed off that merchandise to unsuspecting customers.

---

2. It is also apparent that Soren knew how to indicate returns when appropriate. For example, a check dated May 2, 2002, indicates that DFA purchased 49 "Fendi Mama" bags at $100 and indicates $255 of "RETURN". As expected, the check is made out in the amount of $4,645 (*i.e.*, 49 times 100 minus 255). Eight other checks have a notation of "RETURN," only one of which appears to pertain to Gucci merchandise. The notion that the remaining 30 Gucci checks were actually for returns of Gucci merchandise, even though they were not marked as such, is not credible.

3. When served with the complaint, Soren signed the receipt with the name "David Cone" (as in the Major League pitcher), instead of with his real name. This is a small example of how Soren's conduct cast doubt upon his credibility.

4. The Court notes that at least three of the checks from DFA to Harvest Wrap are explicitly marked as pertaining to "Jackie O" handbags.

Soren conceded at trial that "one or two" of the Harvest Gucci items "could have slipped in there," and at one point he even suggested that Gucci's lawyers planted the counterfeit Gucci merchandise on DFA's selling floor. (Tr. 55, 85–86) The Court rejects the notion that all of the counterfeit sales were innocent, or accidental. Of the six items the Court has already determined are counterfeit, one was sold as early as August 2000 and another as late as November 2003. It is simply beyond belief that all six of those items could have accidently been mixed in with DFA's stock for such a long period of time.

One particularly egregious example, involving the Jackie O model the Court just mentioned, clearly demonstrates that Soren acted willfully, not innocently. At the contempt hearing, Gucci witness Vicki Richards ("Richards") testified that she called DFA to purchase a $471 Jackie O model handbag and that she sought to have it shipped overnight. The DFA person answering the phone, "Cindy", said that Richards would have to wait at least a week because the bag was at DFA's "other site." (Hg. 22)

Three months later, Gucci's lawyers inspected the merchandise which Soren had just revealed was stashed away in his garage on Long Island. They found, and admitted as evidence at trial, a Jackie O model handbag remarkably similar to the one Richards had purchased. Soren conceded at trial that the leather on the two bags was similar. The Court's own inspection of the bags confirms that the leather appears to be of an identical (and relatively poor) quality. At the time of Richards' testimony in December 2003, it was unclear what was meant by the reference to a second "site," but now a reasonable inference that may be drawn from these facts is that "Cindy" – probably DFA employee Cindy Katz ("Katz") – was referring to Soren's garage in Long Island. The similarity of the two bags at issue bolsters the Court's previous conclusion that the first Jackie O bag went from Harvest Wrap to DFA and ultimately (via Soren's garage) to a customer, and that it was plainly counterfeit. Soren's conduct in selling that bag – pulling it from his garage stash after the Court's injunction – is especially brazen.

The Court concludes that it is more likely than not that all the Gucci brand merchandise DFA obtained from Harvest Wrap was counterfeit because Davidsen, the sole shareholder of Harvest Wrap, testified that he obtained his Gucci goods from a single source in the British Virgin Islands. Furthermore, Soren brought seven Gucci bags to the December 2003 hearing in an attempt to show that he only sold authentic merchandise, but notably none of those bags originated from Harvest Wrap.

## C. *DFA'S OTHER SOURCES*

At the same time Soren sought to minimize his association with Harvest Wrap, he sought to emphasize his relationship with his suppliers in Italy. Soren testified that he frequently visits various high-end stores in Italy to purchase designer merchandise from the managers of those stores at a bulk discount. In response to interrogatories, Soren identified only Harvest Wrap as his source because, as he would later reveal, he wanted to keep secret his Italian sources.

Soren testified at trial that he obtained merchandise from "five or six groupings of stores" in Italy, but he ultimately produced invoices from only two Italian companies. (Tr. 182) Soren refused to disclose the remaining sources because, in his words, "I know that if I give up these people's names, I'm out of business." (*Id.*) Soren claims that if Gucci or any other high-end designer knew that its authorized

stores were selling their goods in bulk to a discounter like DFA, the designers would retaliate by limiting or cutting off their sales to those stores. Indeed, Soren claims this is the motivation for Gucci's lawsuit. Nevertheless, Soren assured the Court that those unnamed stores sell only authentic merchandise because they are "beautiful store[s]" located in "great area[s]" of Italy, equivalent to Fifth Avenue or Madison Avenue in New York City. (Hg. 88)

At trial, Gucci compellingly demonstrated that at least one of those suppliers, a company called SAM, S.R.L. ("SAM"), assisted Soren in defrauding U.S. Customs by understating the value of the goods Soren purchased. Although customs fraud is not directly at issue in this lawsuit, it gives the Court pause in crediting evidence from either that source or Soren himself.

A SAM invoice (corroborated by Soren's credit card bills) showed that Soren paid about $100,000 for a shipment of goods from SAM in the summer of 2003. Testimony from Soren's customs broker revealed that SAM had actually produced a second, virtually identical invoice for DFA to give to U.S. Customs for the purpose of determining the proper import taxes which DFA would owe. The crucial difference was that the second invoice stated that Soren paid only about $25,000 for the goods, thereby substantially lowering his tax liability. At trial, Soren attempted, quite unconvincingly, to explain the discrepancy by stating that most of the $100,000 was actually a *deposit* towards the future purchase of other goods, a practice he described as routine. There is nothing on the invoice to suggest as much, and the Court notes that in all previous questioning regarding those invoices, Soren never mentioned the alleged practice of leaving substantial deposits.

An examination of other SAM invoices reveals more suspicious activity. Soren admitted into evidence at the contempt hearing a bag originating from SAM which bore a price tag reading:

*DUTY FREE*

| Compare Price | 890 |
| Our Price | 725 |

(Hg. Def. Ex. 3) That model of bag is indicated on one SAM invoice as having been purchased for under $50. This fact suggests either that Soren accidently produced to the Court one of the phony invoices that may have been used to defraud U.S. Customs, or that SAM's Gucci brand merchandise was astonishingly cheap.

At trial, Soren testified that he had indeed only paid $50 for the bag, but he nonetheless insisted both that the merchandise was authentic and that DFA's ordinary profit margin on Gucci's bags was about 30 to 40 percent. Soren, again unconvincingly, explained the relatively low purchase price by stating that the bag would likely have been discounted to sell for about $250, if it had not initially sold for $725. He also testified: "It shouldn't matter what I paid for the goods. It's nobody's business." (Tr. 125) The Court disagrees with Soren on this point. If he had actually paid only $50 for a bag which retails for almost $900, Soren should have had all the more reason to question its authenticity.

Unfortunately, the Court cannot make any explicit findings as to whether Soren actually has legitimate sources in Italy because he refused to disclose those sources, or to give the Court any reason to believe he had legitimate means of obtaining authentic Gucci merchandise.[5] Although

---

**5.** The Court is mindful of Soren's charge that Gucci may be motivated to bring such lawsuits for the purpose of plugging the leaks in its supply chain, at the expense of innocent

Soren admitted into evidence Gucci merchandise which appears to be authentic, the Court can hardly infer from that fact alone that Soren has a regular source of authentic Gucci merchandise, especially in light of Soren's severely diminished credibility.

## D. *DFA'S GUCCI SALES*

To determine the proper amount of damages, the Court will have to make its best efforts to calculate the extent of DFA's sales of counterfeit Gucci merchandise. Regrettably, compounding Soren's credibility concerns, DFA maintained spotty, and occasionally false or misleading accounts of the relevant transactions, a matter for which it must bear the burden of any doubts or unfavorable inferences.

The most reliable evidence in the record is in the approximately 115 cancelled checks from DFA to Harvest Wrap (whose Gucci goods the Court concludes are fake), 31 of which, according to specific notations on the checks or check stubs, pertain to Gucci merchandise. The checks total just over $1 million, about $250,000 of which is accounted for in the Gucci-related checks. Another $200,000 of the $1 million pertain to purchases of other brand name merchandise, such as Prada and Fendi. The remaining checks, totaling $550,000, are not marked with any brand at all.

Davidsen, Harvest Wrap's principal, testified that he sold DFA handbags for approximately $150 and cosmetic bags for approximately $60. The cancelled checks support that testimony because all of the Gucci checks which are noted with a specific price and quantity fall into two distinct price ranges: $49 to $60, and $125 to

$150. There are no checks reflecting sales of Gucci merchandise outside those price ranges. Approximately 62 percent of the value of the Gucci checks which are fully marked with the items' price and quantity pertains to the larger price range, and the remaining 38 percent pertains to the smaller price range.[6] The Court concludes that the first range pertains primarily to cosmetic bags, and the second range pertains primarily to handbags.

Although Soren testified that he typically marks up goods 30 to 40 percent, the Court concludes, based on Soren's other contradictory evidence, that, at least with respect Harvest Wrap's Gucci brand merchandise, Soren marked up the goods much higher. DFA's website sells Gucci cosmetic bags for $150 and Gucci handbags for approximately $350. Assuming the prices on DFA's website are not materially different from DFA's store prices, the Court concludes that, with respect to goods originating from Harvest Wrap, Soren marked up Gucci cosmetic bags about 150 percent and handbags about 133 percent.

The Court also finds that DFA more likely than not had at least one other source of counterfeit Gucci merchandise. For example, the Court determined in connection with the contempt proceeding that DFA sold a counterfeit key case, but none of Harvest Wrap's importation records indicate that it ever sold key cases, and Davidsen specifically asserted that none of the Harvest Wrap sales to DFA involved key cases.

The Court cannot make any further detailed findings about the extent of the

---

retailers. The Court need not address that issue here because all the evidence suggests that DFA is a knowing trademark infringer, not an innocent retailer.

**6.** Approximately 60 percent of the total number of items on those checks are items within the smaller range of prices; the remaining 40 percent of the number of items are in the larger range.

counterfeit sales because Soren and Davidsen, by their own admissions, did not keep detailed records.

## II. CONCLUSIONS OF LAW

■ Having found that DFA and Soren willfully violated the Lanham Act and willfully committed contempt by violating the Court's injunction, the Court must determine the proper monetary damages and a proper injunctive relief. As to the monetary damages, Gucci has elected to receive statutory damages under Section 35(c) of the Lanham Act, see 15 U.S.C. § 1117(c), for both the contempt and the underlying Lanham Act violations.[7]

■ Congress added the statutory damages provision of the Lanham Act in 1995 because "counterfeiters' records are frequently nonexistent, inadequate, or deceptively kept ..., making proving actual damages in these cases extremely difficult if not impossible." S.Rep. No. 104–177, at 10 (1995). For willful violations, plaintiffs may recover between $500 and $1 million "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2). The statute "does not provide guidelines for courts to use in determining an appropriate award," *Louis Vuitton Malletier v. Veit*, 211 F.Supp.2d 567, 583 (E.D.Pa.2002), as it is only limited by what "the court considers just." 15 U.S.C. § 1117(c). However, courts have found some guidance in the caselaw of an analogous provision of the Copyright Act, 17

U.S.C. § 504(c), which also provides statutory damages for willful infringement. *See, e.g., Louis Vuitton*, 211 F.Supp.2d at 583; *Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F.Supp.2d 161, 166 (S.D.N.Y.1999). Under the Copyright Act, courts look to factors such as: (1) "the expenses saved and the profits reaped;" (2) "the revenues lost by the plaintiff;" (3) "the value of the copyright;" (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;" and (7) "the potential for discouraging the defendant." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir.1986).

To the extent possible, statutory damages "should be woven out of the same bolt of cloth as actual damages." *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[E][1], at 14–69 (2003). Under Section 35 of the Lanham Act, actual damages for a willful violation generally include three times the amount of the defendant's profits or the plaintiff's losses (whichever is greater), plus attorney's fees. *See* 15 U.S.C. § 1117(b).

■ Under the statutory damages provision applicable here, the parties agreed in their joint pretrial order that a willful violation would give the Court discretion to award between $2,000 and $2 million in damages.[8] Not surprisingly, DFA and

---

7. Because Soren made all of the decisions for DFA as to what merchandise to offer for sale, he is liable individually to the same extent as the corporation, DFA. *See Federal Trade Comm'n v. Standard Educ. Soc.*, 86 F.2d 692, 695 (2d Cir.1936), *modified on other grounds*, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937).

8. The Court notes that the maximum statutory damages is arguably higher than $2 million.

Even though there are only two marks on the counterfeit goods, the statute authorizes (for willful violations) up to $1 million "per counterfeit mark *per type of goods ... sold.*" 15 U.S.C. § 1117(c)(2) (emphasis added). In considering the six items the Court has determined are counterfeit, an additional $1 million in damages is theoretically available for each of: (1) the repeating "GG" mark on the three handbags, (2) the "GUCCI" mark on the

Soren urge the Court to award Gucci only $2,000 in damages, and Gucci seeks the full $2 million. After considering the factors explained above, the Court considers just an award of $2 million.

First, the Court examines DFA's ill-gotten profits. As stated, DFA wrote about $250,000 in checks to Harvest Wrap which were marked with "Gucci." Comparing the proportion of Gucci checks to those checks marked with other brands, and assuming that that proportion applies to the unmarked checks, the Court can estimate that DFA purchased about another $300,000 worth of Gucci merchandise from Harvest Wrap, for a total of about $550,000. Taking into account the average markup of the goods as divided among handbags and cosmetic bags, the Court concludes that DFA stood to profit about $767,000 on Harvest Wrap's Gucci brand merchandise during the relevant period. Because Soren has not sold the approximately 370 pieces he has stored in his garage on Long Island, the Court reduces its estimate of DFA's profits to about $720,000.

The Court recognizes that this figure involves many assumptions, but the Court must rely on those assumptions only because of DFA's poor record keeping. The Second Circuit has held that a counterfeiter who keeps poor records "must bear the burden of uncertainty" in determining a damages award. *See Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972–73 (2d Cir.1985). Moreover, the Court's estimate may actually understate the DFA's illegitimate profits because it does not take into account other potential sources of counterfeit Gucci merchandise and the degree to which Gucci merchandise and advertising enticed customers into DFA's store, leading to purchases of other brands.

Second, in regard to Soren's willfulness, the Court notes that over the two-year time period, Soren was, at best, acting with willful blindness or, at worst, exhibiting bold contempt for the law. As explained above, none of a string of warning signs induced Soren to make a reasonable inquiry into the authenticity of his Gucci brand merchandise. "[S]elling products acquired outside the customary chain of retail distribution and without the usual authenticating documentation" is a "high risk business." *See Gucci America, Inc. v. Daffy's Inc.*, 354 F.3d 228, 245 (3d Cir. 2003) (Rosenn, J., dissenting). In the face of that risk, it was unreasonable for Soren to rely on the self-serving assurances of Harvest Wrap, or his admittedly inexpert opinion about the authenticity of the goods. Moreover, Soren was also unreasonable in relying, as he asserted, on the absence of litigation by other designers; Soren should have known that a defendant who waits to get sued to determine whether his merchandise is legitimate runs the risk (as has happened here) of losing that lawsuit. Such "willful ignorance" would be sufficient to trigger the heightened penalties of the actual damages provisions of the Lanham Act. *See International Star Class*

wallet, (3) the "GUCCI" mark on the key case, and (4) the repeating "GG" mark on the cosmetic bag (if it is considered a separate "type of good" from a handbag). By way of illustration, one federal court awarded Nike, Inc., four separate awards of damages for the defendant's counterfeit sales of goods bearing the same "SWOOSH" trademark, one separate award for each of counterfeit (1) socks, (2) shirts, (3) sweatshirts, and (4) sweatpants. *See Nike Inc. v. Variety Wholesalers, Inc.*, 274 F.Supp.2d 1352, 1374 (S.D.Ga.2003). Because Gucci does not ask for more than $2 million, and because the Court considers a higher award excessive, the Court does not directly decide the issue of the statutory maximum damages potentially recoverable here.

*Yacht Racing Ass'n v. Tommy Hilfiger,* 80 F.3d 749, 753–54 (2d Cir.1996).

The fact that most of the goods Soren sold may have been high-quality counterfeits slightly mitigates Soren's culpability, at least in the initial time frame. However, by the time the Court had ruled on Gucci's summary judgment motion, Soren's conduct was more severe. As explained above, Soren knew that Gucci's expert and this Court had determined that Harvest Wrap's Gucci brand merchandise was counterfeit, and Soren knew he was under an injunction not to sell counterfeit merchandise. Nevertheless, Soren sold at least three more counterfeit Gucci items within a month of the Court's injunction. The fact that Soren probably retrieved at least one of those items (the Jackie O bag) from his undisclosed stash of Gucci merchandise in his Long Island garage demonstrates that those sales were no accident.

Gucci would have been automatically entitled to treble damages had it elected actual (versus statutory) damages under Section 35(b) of the Lanham Act. *See* 15 U.S.C. § 1117(b). The Court follows the lead of another judge in the District in concluding that it is an "unadventurous corollary" to also treble any determinable damages when awarding statutory damages because "[s]tatutory damages give even greater weight to the need to deter and punish." *Sara Lee,* 36 F.Supp.2d at 170. Accordingly, the Court awards Gucci $2 million in statutory damages.

■ Gucci urges the Court to make an additional award of attorney's fees, and Gucci correctly points out that attorney's fees are generally awarded, absent "extenuating circumstances," as a measure of actual damages for willful counterfeiting.

*See* 15 U.S.C. § 1117(b). However, Gucci has elected to pursue statutory damages, which are available *"instead* of actual damages." 15 U.S.C. § 1117(c) (emphasis added). Thus, the presumption of attorney's fees does not apply here (except to the extent that actual damages are a persuasive measure towards determining statutory damages), and any such application is simply another factor in the mix of the Court's broad discretion to award statutory damages. *Cf. Sara Lee,* 36 F.Supp.2d at 170 (holding that the trebling provision of 15 U.S.C. § 1117(b) is not automatically applicable to the statutory damages calculation of § 1117(c)).[9]

The Court concludes that attorney's fees are not appropriate in this case because the Court's $2 million statutory damages award – in addition to the Court's now five-month old blanket injunction and its award of attorney's fees in connection with the contempt hearing – more than sufficiently advances the goals of deterrence and compensation in this case. *Cf. Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (noting that compensation and deterrence are two factors for courts to consider in awarding a prevailing party discretionary awards of attorney's fees). First, by trebling the Court's calculation of DFA's Gucci-related profits, the Court's award likely overcompensates whatever lost profits Gucci actually suffered. Second, the substantial award will likely have a material, if not fatal, effect on DFA's business, thereby more than advancing the goals of deterrence. The Court concludes that any additional damages award would increase the punishment to DFA without materially advancing any deterrent effect. *Cf. TVT*

---

**9.** In this regard, the structure of the Lanham Act is notably different from the Copyright Act, in which the attorney's fees provision, *see* 17 U.S.C. § 505, is set apart from the provisions for actual and statutory damages, *see* 17 U.S.C. § 504, and thus not subsumed as part of the calculation of either.

*Records v. Island Def Jam Music Group,* 288 F.Supp.2d 506, 511 (S.D.N.Y.2003) (declining to award attorney's fees where such an award would duplicate factors already accounted for in punitive damages award).[10]

■ The Court must also determine the proper injunctive relief. Although "[i]njunctive relief should be narrowly tailored to fit specific legal violations," *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994), the Second Circuit has recognized the principle that "a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 220 (2d Cir.2003) (quoting 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 30:4, at 30–12 (4th ed.2003)); *see also United States v. Loew's, Inc.,* 371 U.S. 38, 53, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) ("To ensure … that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined.").

In this case, Soren, through his repeated infringing conduct and his overwhelming amount of dubious testimony, has thrown into question not only his credibility, but his trustworthiness as well. Gucci urges the Court to continue the existing injunction, barring Soren from selling any Gucci merchandise ever, whether real or counterfeit. Soren pleads that he be given one more chance. He proposes an injunction whereby, if he were ever found to have sold a counterfeit Gucci item in the future, he would be forever barred from selling Gucci merchandise, whether real or counterfeit.

The Court adopts a path in the middle. Gucci's remedy is too extreme because only in the most unusual circumstances could a such a categorical ban on the sale of genuine goods be considered "narrowly tailored" to the violation. *Waldman Pub. Corp.,* 43 F.3d at 785. Moreover, considering that the Court's substantial damages award should prove a sobering deterrent to Soren and DFA, the Court considers a blanket and perpetual injunction to be excessive.

Nevertheless, the Court agrees with Gucci that, given DFA's extensive record of infringement, Gucci should not have to police DFA yet again, possibly inviting another round of litigation and expert testimony. The Court's more streamlined solution is to order that DFA and Soren obtain Gucci merchandise only directly from Gucci-authorized dealers, as determined by Gucci, and that DFA and Soren maintain adequate records in that regard.

As stated above, the Court is mindful of Soren's claim that revealing his sources to Gucci effectively amounts to eliminating those sources and to drive him entirely out of the Gucci business. The Court notes that in at least two other lawsuits, Gucci has faced the charge that its main purpose behind its counterfeiting lawsuits is to plug leaks in its supply chain, at the expense of discount retailers. *See Gucci America,*

---

**10.** The Court likewise rejects Gucci's second basis for awarding attorney's fees. Gucci has moved the Court to enter a finding that, in addition to the federal claims, DFA and Soren have violated New York's deceptive business practices statute. *See* N.Y. Gen. Bus. Law § 349. The Court agrees that DFA and Soren have misled customers into believing they were purchasing authentic Gucci merchandise, thereby injuring Gucci. Thus, Gucci has proven a § 349 violation. *See Stutman v. Chemical Bank,* 95 N.Y.2d 24, 709 N.Y.S.2d 892, 731 N.E.2d 608, 611 (2000) (listing elements). That provision furnishes a separate basis for awarding attorney's fees, *see* N.Y. Gen. Bus. L. § 349(h), but for the same reasons discussed in connection with the Lanham Act, the Court declines to award attorney's fees.

*Inc. v. Daffy's Inc.*, No. 00 Civ. 4463, 2000 WL 1720738, at *6–*7 (D.N.J. Nov. 14, 2000); *Gucci America, Inc. v. Costco Cos., Inc.*, No. 98 Civ. 5613, 2000 WL 60209, at *1–*3 (S.D.N.Y. Jan. 24, 2000). Were the Court to permit Soren to sell Gucci merchandise only if he notified Gucci of the source of those goods, the Court recognizes the strong possibility that such relief would effectively bar Soren from ever selling authentic Gucci merchandise – a sanction the Court has already stated is too severe and inconsistent with this country's notions of free enterprise and vigorous competition.

Accordingly, the Court proposes a solution which will permit Soren to sell legitimate Gucci goods, and also hopefully avoid further litigation. First, the Court will order Gucci to turn over to the Court and to DFA a list of the names and addresses of its authorized dealers in the United States and in Italy from which any purchase of Gucci merchandise would presumptively entail legitimate goods, and thus not raise Gucci objections to the authenticity of the products. Second, the Court will order that Soren obtain Gucci merchandise for sale only from dealers on that list, and that he maintain records (such as invoices) with accurate and substantial detail of those purchases for at least two years following any purchase. If Soren indeed buys only from high-quality retailers in Italy (as he claimed at trial), those stores will no doubt be included on the list.[11] Third, if Gucci has any reason to doubt the authenticity of merchandise marketed by Soren or DFA, the Court will permit Gucci to demand that Soren produce to the Court, *in camera*, the appropriate invoice or invoices of the purchases. In the event the items do not originate from an authorized dealer, the Court will

presume that such goods are not authentic and hold DFA and Soren in contempt for violating the terms of the injunction. Finally, the Court will order that Soren return any Gucci brand merchandise he obtained from Harvest Wrap, such as the 370 pieces he has stored in his garage.

■ The Court must address one outstanding matter before a final judgment can be entered. After determining that DFA violated the Court's injunction, the Court ordered that Gucci be awarded reasonable attorney's fees and costs associated with investigating and litigating that violation. The Court addresses that application now.

Gucci seeks fees and costs in the amount of $59,584.62; DFA argues that that figure should be reduced to $35,572.33. The Court concludes that the full amount of Gucci's application is reasonable and that all of DFA's objections are without merit.

At the outset, the Court echoes observations of another judge in this District, which are apt to this case:

> [T]he fees sought here are not hypothetical amounts prepared only for purposes of a fee application. Rather, they are embodied in invoices prepared as the litigation progressed, and actually paid by [Gucci], a sophisticated client [who] could not have been assured that it would be awarded fees at the end of the [contempt proceeding]; rather, in the event of a loss or a settlement, it would have had to bear those fees unreimbursed. As numerous courts have recognized, negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market.... Certainly, [Gucci] could have found cheaper lawyers, but it was not required to do so. [Gucci] chose

11. Soren also indicated that he occasionally buys Gucci merchandise from Gucci outlet stores, which, again, would presumably be on Gucci's list of authorized dealers.

*these* lawyers, agreed to be responsible for their fees, and paid them, without regard to whether the fees would be recovered . . . .

*Bleecker Charles Co. v. 350 Bleecker Street Apartment Corp.*, 212 F.Supp.2d 226, 230 (S.D.N.Y.2002) (emphasis in original).

Turning to the specific objections, DFA first objects to the hourly billing rates of the two Gucci lawyers on this case, $425 for the partner, and $290 for the associate. The two lawyers are experts in trademark law who have published articles on the topics at issue in this litigation. The Court concludes that those rates are reasonable and notes that the rates are within the range of rates approved by other courts in this District. *See, e.g., Yurman Designs, Inc. v. PAJ, Inc.*, 125 F.Supp.2d 54, 58 (S.D.N.Y.2000) (approving hourly rates of $520.69 for a partner and $278.50 for an associate at a mid-sized intellectual property law firm); *Stevens v. Aeonian Press, Inc.*, No. 00 Civ. 6330, 2002 WL 31387224, at *5 (S.D.N.Y. Oct. 23, 2002) (approving, in a copyright case, hourly fees of $460 for partners and, on average, $284 for associates at a large New York City law firm).

DFA objects to a number of Gucci's billing records as "vague," but the Court disagrees with that charge. For example, although DFA claims that one billing entry – "begin drafting motion papers on contempt motion" – is vague, the Court finds the description perfectly clear. In fact, DFA charges that five of the eight billing entries related to drafting the contempt motion are "vague," even though it is clear what Gucci's lawyers were doing: writing the motion which was eventually filed with the Court and granted. The Court notes additionally that Gucci's lawyers spent a combined 30 hours preparing that motion, which, considering that the motion was detailed and carefully drafted, is not an unreasonable amount of time.

DFA also charges that a number of billing entries are improperly "grouped." That is, Gucci's lawyers described multiple tasks within one single time entry. DFA cites no authority that grouping automatically renders the billing entry unreasonable. For each challenged entry, the total time is reasonable when considering all the tasks taken together.

■ DFA, again without citing authority, challenges Gucci's entrys related to legal research. However, the attorneys undoubtedly performed significant legal research in preparing the contempt motion, and that research takes time – billable time which is recoverable as any other reasonable billable time.

■ Next, DFA asserts that it was improper for the two attorneys to attend the same deposition where only the partner conducted the deposition. The Court disagrees. In this case, the same two attorneys have been intimately involved in this litigation on Gucci's behalf from the beginning, and the partner undoubtedly benefitted from having the associate present to assist, especially where, as here, the deposition occurred just two days before the hearing. *Cf. New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983) ("[P]revailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist."). The Court notes that, even considering the compressed two-week time schedule between the Court's preliminary injunction and the contempt hearing, Gucci's attorneys did not resort to involving an arsenal of other associates to help in the undoubtedly frantic task. The same two lawyers undertook the entire workload.

■ DFA charges, again without authority, that Gucci should not recover its

fees in connection with preparing the attorney's fees application itself. The courts have ruled to the contrary on this point. *See Weyant v. Okst,* 198 F.3d 311, 316 (2d Cir.1999).

■■■■ DFA makes three objections to Gucci's costs application, none of which have merit. First, DFA objects to the fees of the interpreter who translated on behalf of Gucci's Italian expert. DFA suggests that Gucci should have chosen an English speaking expert. The Court disagrees. Gucci's goods are made in Italy, and it is unsurprising that the person Gucci considered most qualified to authenticate its goods is also from Italy, and speaks Italian. Second, DFA challenges Gucci's fees for its deposition transcript of Soren. Gucci persuasively points out that, because of the Court's compressed schedule, Gucci deposed Soren only two days before the hearing, thereby requiring Gucci to pay the higher overnight service fee. Third, DFA challenges Gucci's costs pertaining to Westlaw research. The Court agrees with courts in this District that those costs are out-of-pocket expenses ordinarily charged to the client and therefore, reimbursable. *See Bleecker Charles Co.,* 212 F.Supp.2d at 231 n. 6.

Accordingly, the Court's final judgment will award Gucci a total of $2,059,584.62.

## III. *FINAL JUDGMENT AND ORDER*

For the reasons stated, it is hereby

**ORDERED** that defendants Duty Free Apparel, Inc. ("DFA") and Joel Soren ("Soren" and collectively "Defendants") are found liable, jointly and severally, to plaintiff Gucci America, Inc. ("Gucci") in the amount of $2,059,584.62 for violations of the Lanham Act and New York General Business Law § 349 determined by the Court's Order of October 6, 2003, and as compensation for attorney's fees and costs in connection with prosecuting Defendants' contempt determined by the Court's Order of December 19, 2003; it is further

**ORDERED** that Gucci provide to the Court and to Defendants within 30 days of the date of this Order a list of the names and addresses of all of its authorized dealers in the United States and Italy; it is further

**ORDERED** that the Court's previous injunction, dated December 19, 2003, is amended as follows. Defendants are enjoined from selling any merchandise bearing any trademarks owned by Gucci, unless Defendants maintain records demonstrating that that merchandise originated from an authorized Gucci dealer, as determined by Gucci. Defendants shall maintain those records in accurate and substantial detail (including the quantity and style numbers for any goods purchased) for a period of two years after any purchase, and Defendants shall provide copies of those records to the Court for inspection, within a reasonable time after Gucci or the Court so requests; and it is finally

**ORDERED** that Defendants shall turn over to Gucci for destruction all Gucci brand merchandise still in Defendant's possession originating from defendant Harvest Wrap, Inc.

The Clerk of Court is directed to enter final judgment accordingly and to close this case.

**SO ORDERED.**