Augustine BETANCOURT and Lambert Watson, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Rudolph W. GIULIANI, in his official capacity as Mayor of the City of New York, Howard Safir, in his official capacity as Police Commissioner of the City of New York, and The City of New York, Defendants.

No. 97 Civ. 6748(VM).

United States District Court,
S.D. New York.

July 13, 2004.

Daniel J. Leffell, Douglas Lasdon, New York City, for Plaintiffs.

Albert Fredericks, Paul A. Crotty, Corporation Counsel for the City of NY, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

In this attorney's fees application, the Court must determine a reasonable fee for a plaintiff whose broad civil rights class action complaint ultimately resulted in only modest, individual success. In September 1996, the Manhattan law firm of Paul, Weiss, Rifkind, Wharton and Garrison, LLP ("Paul Weiss") began researching the prospect of challenging New York City's (the "City") policy of arresting homeless persons sleeping in public spaces. Paul Weiss eventually found two plaintiffs who had been arrested in a Feb-

ruary 1997 park sweep and, in September 1997, filed a class action complaint on their behalf against the City, then-mayor Rudolph Giuliani ("Giuliani"), and then-Police Commissioner Howard Safir (collectively the "Defendants"). The complaint sought to invalidate the City ordinance under which the plaintiffs were arrested, and it sought class-wide damages for all those similarly situated. After compiling close to $1 million in fees and expenses, the lawsuit's only success has been that one plaintiff, Augustine Betancourt ("Betancourt"), obtained a $15,000 settlement for having been unlawfully strip searched. The lawsuit (thus far) has failed to overturn the challenged ordinance, or to even have a class certified. For these reasons, and those set forth more fully below, the Court considers reasonable an award of $55,976.19.

## I. BACKGROUND [1]

In July 1996, the New York City Police Department ("NYPD") issued a guide listing thirty-five law enforcement tools for its officers to implement the Giuliani administration's "Quality of Life Initiative," which, among other things, sought to remove the homeless from public spaces. The guide included Section 16–122 of the New York City Administrative Code, which states in relevant part:

It shall be unlawful for any person, such person's agent or employee to leave, or to suffer or permit to be left, any box, barrel, bale of merchandise or other moveable property whether or not owned by such person, upon any marginal or public street or any public place, or to erect or cause to be erected there-

on any shed, building or other obstruction.

N.Y.C. Admin. Code § 16–122(b) (2000).

On February 27, 1997, Betancourt, a homeless man, entered Collect Pond park in lower Manhattan and fell asleep on a park bench inside a tube he had fashioned from cardboard boxes. That evening, the NYPD arrested Betancourt and approximately twenty-six other individuals in the park, many of whom were also homeless. Betancourt was subjected to a strip search while in custody and he was not released until the morning of March 1. His papers indicated he was arrested for violating Section 16–122, but the New York County Assistant District Attorney ultimately declined to prosecute the case.

In September 1997, Betancourt and another individual arrested in the park sweep, Lambert Watson,[2] filed the class action complaint in this action, signed by *pro bono* counsel Paul Weiss and the Urban Justice Center. Paul Weiss had been contemplating such a lawsuit at least as early as September 1996, long before the Park sweep. The complaint alleges, in short, that, under the Quality of Life Initiative, the City had applied Section 16–122 as a broad anti-vagrancy statute which unlawfully punished New Yorkers for merely existing in public with some of their personal belongings. Among the 17 causes of action are (1) that Section 16–122 is vague and overbroad as applied to the sweep victims; (2) that the sweep victims were arrested without probable cause and subjected to unreasonable strip searches and property seizures; and (3) that the City's selective enforcement violated the

---

**1.** The factual summary derives from the Declaration of Eric Twiste in Support of Plaintiff Bentacourt's Application for an Award to Counsel of Attorney's Fees, Expenses, and Related Costs, dated March 2, 2004, and the Declaration of Ave Maria Brennan in Response to Plaintiff's Application for Fees and

Costs, dated April 30, 2004, as well as the exhibits attached to those documents. The Court will not cite these sources further.

**2.** Watson was dismissed from the case because he has disappeared.

Equal Protection Clause of the United States Constitution.

In an oral ruling in May 1997, Judge Sprizzo (then the District Judge assigned) denied Betancourt's motion to preliminarily enjoin City officials from arresting persons under Section 16–122. After extensive discovery and briefing on cross motions for summary judgment, Judge Martin (to whom the case was later reassigned), granted Betancourt summary judgment on the unlawful strip search claim, but granted Defendants summary judgment as to every other claim. *See Betancourt v. Giuliani*, No. 97 Civ. 6748, 2000 WL 1877071 (S.D.N.Y. Dec. 26, 2000). Judge Martin also denied Betancourt's motion for class certification. *See id.* at *7.

On the strip search claim, the Court determined that the alleged violation of law for which Betancourt was arrested, which carried a maximum sentence of ten days' imprisonment, did not justify a strip search, absent any suspicion that Betancourt was concealing weapons or other contraband. *See id.* Betancourt appealed Judge Martin's order, but the Second Circuit, *sua sponte*, determined that it lacked jurisdiction because the order was not a final judgment. *See Betancourt v. Giuliani*, 30 Fed.Appx. 11, 2002 WL 226408 (2d Cir.2002).

After the dismissal, the parties settled the strip search claim—the only claim standing in the way of appellate jurisdiction—for $15,000 and this Court entered final judgment in February 2004. Betancourt appealed the merits of Judge Martin's order again, and that case is pending before the Second Circuit (Docket No. 04–0926).

Now before the Court is Betancourt's motion for attorneys' fees and costs under 42 U.S.C. § 1988. The Court must determine a reasonable award in light of the limited success of the lawsuit so far.

## II. DISCUSSION

The Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, governs this motion and states, in relevant part: "In any action or proceeding to enforce a provision of section [ ] ... 1983[,] the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...." It is undisputed that Betancourt is a prevailing party within the meaning of § 1988, leaving only the question of what amount is reasonable.

The Supreme Court has stated that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," a figure commonly called the "loadstar." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The district court then may adjust the loadstar based upon a number of factors,[3] the "most critical" of which "is the degree of success obtained." *See id.* at 436, 103 S.Ct. 1933. As the Supreme Court held: "The result is what matters." *Id.* at 435, 103 S.Ct. 1933.[4]

---

3. In adjusting the loadstar, courts generally consider the following twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974): "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or

the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *See Hensley*, 461 U.S. at 430 n. 3, 103 S.Ct. 1933 (citing *Johnson*, 488 F.2d at 717–19).

4. Betancourt, as the fee applicant, "bears the burden of establishing entitlement to an

Betancourt acknowledges that the lawsuit has been only a partial success so far. He proposes that the Court first excise the fees pertaining to the failed appeal and then, to account for the limited success, reduce the remaining fees by eighty percent, for a total award of approximately $156,000. Although Defendants do not propose an alternative reasonable fee award, it is clear they would have the Court award a much lower figure. Defendants suggest that, even before making an across-the-board reduction to account for the lawsuit's limited success, the Court should excise a large portions of the bills which they contend do not pertain to the successful strip search claim. Defendants also claim Paul Weiss's hourly rates are too high, and that certain costs and expenses should be eliminated.

## A. *HOURLY RATE*

■ The Court first turns to the appropriate hourly rate to apply to Betancourt's application. On average, Paul Weiss's attorneys "charged"—it bears recalling that they initiated the litigation as *pro bono* counsel—a rate of about $300 per hour, corresponding to the rates at which Paul Weiss would normally charge its corporate clients for the services of the associate attorneys assigned to this case.[5] Defendants persuasively argue that those rates far exceed the typical rates at which a civil rights attorney would actually charge a paying client. As a judge in this District stated, "there is force in [Defendants'] argument that [they] should not be required to pay for legal services at the rate [a corporate law firm] would charge to, say, General Motors or IBM (should they be among its clients), but should be required to compensate plaintiff only for what would have been charged by a competent

attorney specializing in civil rights litigation." *Pastre v. Weber,* 800 F.Supp. 1120, 1125 (S.D.N.Y.1991). Just as the "negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market," *see Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 315 F.Supp.2d 511, 524 (S.D.N.Y.2004) (quoting *Bleecker Charles Co. v. 350 Bleecker Street Apartment Corp.,* 212 F.Supp.2d 226, 230 (S.D.N.Y.2002)), the fact that the fees here were not actually charged by Paul Weiss to any client suggests that the Court must take a closer look as to whether the hourly rates are reasonable. Moreover, the Court echoes the observation in *Pastre* that Paul Weiss "derive[s] value from undertaking litigation such as this which may indeed far exceed anything [the Court] can award," such as training to younger associates and the recruitment value of a strong *pro bono* practice. *See Pastre,* 800 F.Supp. at 1125. In light of the above analysis, the Court concludes that the average hourly rate should be reduced to $200 per hour. *See Knoeffler v. Town of Mamakating,* 126 F.Supp.2d 305, 312 (S.D.N.Y.2000) (awarding a civil rights lawyer with seven years' experience $200 per hour and collecting supporting cases).

## B. *REDUCTION FOR LIMITED SUCCESS*

Turning to the actual billing entries, the Court notes initially that the Supreme Court has explicitly approved both general approaches which the parties propose: "The district court may attempt to identify specific hours that should be eliminated" (Defendants' suggestion), "or it may simply reduce the award to account for the limited success" (Betancourt's suggestion). *See Hensley,* 461 U.S. at 436–37, 103 S.Ct.

---

award and documenting appropriate hours expended and hourly rates." *Id.* at 437, 103 S.Ct. 1933.

5. The billing records indicate that only a negligible amount of the billing pertains to partners, as opposed to associates.

1933; *see also Green v. Torres,* 361 F.3d 96, 99 (2d Cir.2004). The Court adopts the latter approach and will apply an across-the-board reduction of ninety percent.

Defendants' proposal, which the Court rejects, is that the Court excise certain portions of the bills altogether because, according to Defendants, those bills clearly pertain to issues other than the strip search claim. The Court is not convinced that it is advisable, much less possible, to make such a sharp demarcation, especially considering that the billing record, which is approaching its eight-year anniversary, is so extensive. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983) ("[I]t is unrealistic to expect a trial judge to evaluate and rule on every entry in an application."); *cf. Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 ("A request for attorney's fees should not result in a second major litigation."). For example, Defendants suggest that the hours pertaining to certain depositions, including Betancourt's own deposition, should be eliminated from consideration because the topics discussed did not involve the strip search claim. It would be a tall order for the Court to review all the depositions to try to confirm this assertion, or to otherwise attempt to apportion the depositions' text as between the successful and unsuccessful claims. By way of further example, Defendants suggest that the Court should eliminate all the bills predating the complaint. Again, however, Betancourt's attorneys must have spend *some* amount of time researching and drafting the portion of the complaint pertaining to the successful strip search claim. The Court's review of the billing entries makes it clear that it would be impossible discern that precise amount of time.

Moreover, the Court emphasizes that Defendants' proposed technical review would unlikely produce a more accurate figure. As explained above, even if the Court were to eliminate certain clearly unrecoverable billing entries (*e.g.,* "research class cert. brief"), the vast majority of the billing entries would remain, and, as to those entries, the Court would necessarily have to venture into the inexact science of applying an across-the-board percentage reduction to account for Betancourt's limited success. The imprecision inherent in that calculation would render trivial the more technical points Defendants press here. To be sure, the Court has not ignored altogether Defendants' points in this regard. Defendants' arguments serve to underscore the more basic point, which the Court addresses next, that most of the effort in this litigation, and the bulk of the bills Paul Weiss compiled, pertained to its unsuccessful (so far) attempt to invalidate Section 16–122.

Finally, the Court is mindful that in civil rights litigation there is frequently an overlap of efforts relating to successful claims and to claims that ultimately fail. No surgical standards exist by which to neatly and minutely isolate and sever elements of legal services devoted to this division of claims. In fact, courts recognize that the pursuit of successful causes of action often entails and is inexorably intermingled with claims that do not prevail insofar as the claims involve a common core of facts or are based on related legal theories. *See Gonzalez v. Bratton,* 147 F.Supp.2d 180, 212 (S.D.N.Y.2001) (citing *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1183 (2d Cir.1996)).

■ Turning now to the appropriate percentage reduction, the Court must discern the measure of Betancourt's success, which by all accounts is relatively minimal. In simple terms, Betancourt's complaint attempted to initiate an impact litigation against the Giuliani administration, but to date has achieved virtually no success in

that regard. The Court has not invalidated Section 16–122, nor certified a class on the issue, nor has Betancourt demonstrated that the City has changed its policies in any way as a direct consequence of this lawsuit.[6] The City agreed only to do something which it no doubt does in many of the hundreds of ordinary tort cases it faces each year: to write a check to compensate the victim of an official's unlawful conduct.

Moreover, the Court notes that the strip search claim involved settled law and essentially uncontested facts. The claim comprised only five sentences and a single case citation in Betancourt's summary judgment briefing. Although Defendants denied the strip search claim in their answer, they did not devote a single sentence in their summary judgment briefing to opposing Betancourt's motion for summary judgment on the strip search claim. In other words, Defendants essentially conceded the issue.[7]

In light of the simplicity of the issue, the Court concludes that Paul Weiss must have spent a nominal amount of time on the strip search claim, as compared to the much more complex, unsuccessful claims. Accordingly, the Court concludes that the fees requested should be reduced by ninety percent, instead of the eighty percent which Betancourt suggests.

## C. EXPENSES AND COSTS

"[A]wards of attorney's fees in civil rights suits under fee-shifting statutes ... normally include those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients." *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 282 (2d Cir.1987). All of the expenses in Betancourt's application are those which are typically charged to fee-paying clients and, hence, are recoverable. *See, e.g., Gucci Am.*, 315 F.Supp.2d at 526 (awarding expenses for electronic research); *Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F.Supp.2d 323, 325 (S.D.N.Y.2003) (awarding fees for non-legal support); *Wilder v. Bernstein*, 975 F.Supp. 276, 287 (S.D.N.Y.1997) (awarding expenses for transportation costs); *Cool v. Police Dep't of City of Yonkers*, 620 F.Supp. 954, 957 (S.D.N.Y.1985) (awarding expenses for overtime and duplicating).

Defendants challenge the connection of these costs to the strip search claim. Again, however, the Court will not venture to discern, for example, which photocopies pertain to which of the claims in this lawsuit. Instead, to address Defendants' more fundamental point, the Court will apply the same ninety percent reduction to Betancourt's requests for costs and expenses. This large reduction is also intended to subsume any of Defendants' claims that the costs charged were excessive.

---

**6.** In a separate lawsuit, the City paid a substantial settlement to victims of its unconstitutional blanket policy of strip searching persons arrested for minor offenses. *See* Benjamin Weiser, *New York Will Pay $50 Million In 50,000 Illegal Strip–Searches*, N.Y. Times, Jan. 10, 2001, at A1 (referring to *Tyson v. City of New York*, No. 97 Civ. 3762 (filed May 22, 1997)). Judge Martin declined to certify a class in this lawsuit because one had already been certified in *Tyson*. *See Betancourt*, 2000 WL 1877071, at *7 ("As to the strip-search claim, a class ac-

tion has already been certified and there is no need for another one.").

**7.** The Court does not intend to suggest that Betancourt's award should be reduced by the mere fact that his claim was straightforward. *See DiFilippo v. Morizio*, 759 F.2d 231, 235 (2d Cir.1985) ("[T]he fact that a case is straightforward is not grounds to reduce a lodestar award."). Instead, the Court takes this fact as evidence towards making a proper apportionment of the fee as between the successful and unsuccessful claims.

## D. *CALCULATION OF AWARD*

In accordance with the above discussion, the Court makes the § 1988 award as set forth in the chart below.

| ATTORNEYS | | | |
|---|---|---:|:---:|
| Hours Bills | | 2520.8 | A |
| Hours Spent on Dismissed Appeal | | 259.8 | B |
| | Subtotal of Hours (A–B) | 2261 | C |
| Hourly Rate | | $200 | D |
| | Total (C × D) | $ 452,200 | E |
| *NON–LEGAL SUPPORT* | | | |
| Hours Billed | | 435.3 | F |
| Hours Spent on Dismissed Appeal | | 89.1 | G |
| | Subtotal of Hours (F–G) | 346.2 | H |
| Avg. Hourly Rate | | $ 106.42 | I |
| | Total (H × I) | $ 36,842.60 | J |
| *EXPENSES AND COSTS* | | | |
| Expenses for Full Litigation | | $ 78,086.91 | K |
| Expenses for Dismissed Appeal | | $ 7,367.64 | L |
| | Total of Expenses and Costs (K–L) | $ 70,719.27 | M |
| *TOTAL* | | | |
| Subtotal of Attorney's Fees, Non–Legal Support Fees, and Expenses and Costs (E + J + M) | | $559,761.87 | N |
| Reduction for Limited Success | | 90% | O |
| **TOTAL** (N × [1–O]) | | $ 55,976.19 | |

## III. ORDER

For the reasons stated, it is hereby

**ORDERED** that the motion of plaintiff Augustine Betancourt ("Betancourt") for attorney's fees and costs under 42 U.S.C. § 1988 is granted and defendant the City of New York is found liable to Betancourt in the amount of $55,976.19.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**